PEOPLE *v.* JENNINGS.

1. CRIMINAL LAW—ADULTERATION OF FOOD—LEMON EXTRACT.
    In a prosecution under the pure food law (2 Comp. Laws, § 5012) for selling a compound as lemon extract which was adulterated, the pharmacopœia formula may be taken as the standard for lemon extract.

2. SAME—IMPROVEMENT OF FOOD PRODUCTS.
    The statute does not prevent improving a common article of food where the law and spirit of the act defining adulteration are not infringed.

3. SAME—CONSTRUCTION OF STATUTE.

The provision of 2 Comp. Laws, § 5012, that an article is adulterated, "*second*, if any inferior or cheaper substance or substances have been substituted wholly or in part for it," should be construed in connection with the following provision, "if any valuable or necessary constituent or ingredient has been wholly or in part abstracted from it," and therefore means the substitution of a cheaper or inferior substance for an essential ingredient.

4. SAME—INSTRUCTIONS—LEMON EXTRACT.

An instruction that if *any* ingredient of lemon extract, as defined by the pharmacopœia, was wanting in the extract sold by respondent, there should be a conviction, was erroneous.

5. SAME—COLORING MATTER.

The provision of the statute prohibiting coloring an article, whereby damage or inferiority is concealed, has no application where the coloring matter employed in the manufacture of a lemon extract was not injurious to public health, and the difference from the standard article in other respects consisted only in the elimination of nonessential ingredients.

6. INSTRUCTIONS—EXPERT TESTIMONY.

It is error for a judge, in his charge to the jury, to refer to expert testimony as "boughten testimony."

Exceptions before judgment from Muskegon; Russell, J. Submitted February 20, 1903. (Docket No. 207.) Decided April 7, 1903.

Charles W. Jennings was convicted of violating the pure food law. Reversed.

*Knappen, Kleinhans & Knappen* and *L. N. Keating*, for appellant.

*Charles A. Blair*, Attorney General, and *George S. Lovelace*, Prosecuting Attorney (*Cross, Lovelace & Ross*, of counsel), for the people.

MONTGOMERY, J. This is a prosecution under the pure food law, so called. The respondent was convicted under an information charging him with selling a compound as

a lemon extract which was adulterated, within the meaning of Act No. 193, Pub. Acts 1895, as amended, and was a compound in imitation of extract of lemon. The respondent was convicted, and brings the case up on exceptions before sentence.

The evidence introduced on the trial by the respondent tended to show that lemon oil contains from 3 to 10 per cent. of citral, so called, and upwards of 90 per cent. of so called terpenes; that these terpenes represent the oil properties; that they are in reality the oil itself, freed from the citral; that citral is the principal flavoring and odor-bearing property of lemon oil; that the tendency of the terpenes in the oil of lemon is to deteriorate or become rancid by long standing, and that because of this the extract or spirits of lemon in which terpenes appear in the usual quantities becomes turpentiney, both in smell and taste, and that for this reason it is undesirable to have terpenes present; that the terpenes have a biting taste, easily developing a turpentine taste, not the true flavor of the lemon fruit. There was also testimony tending to show that this fact created a demand for terpeneless oils, and that terpeneless lemon oils had been manufactured and sold commercially for a considerable time.

On the part of the prosecution, the testimony of the chemist of the pure food department was to the effect that, taking as a standard of extract of lemon the spirits of lemon as defined by the United States Pharmacopœia formula, the extract produced by the respondent showed no lemon oil present. It further appears that spirits of lemon made according to the pharmacopœia formula would contain from 25-100 to 35-100 of 1 per cent. of citral. It also appeared that 30 per cent. of alcohol appeared in the product made by respondent, and that, according to the pharmacopœia formula, 80 per cent. was used, and that it cost less to make the extract using but 30 per cent. of alcohol than if 80 per cent. was used. It was also shown that a trace of coal-tar dye was found in the extract made by respondent, but it was conceded that

there was nothing whatever injurious in the extract as prepared by Mr. Jennings. The extract sold by respondent was made by what is known as the "shaking-out process;" the purpose being to make an extract that contains no oil and as little alcohol as possible,—a product that contains simply the flavoring properties of the lemon oil, without the terpenes. This system has been employed by Mr. Jennings and by other manufacturers for the past three years, and it is claimed that all the elements and properties of lemon oil remained, except the terpenes; and the testimony tended to show that the complete flavoring qualities are extracted by this process.

The circuit judge charged the jury as follows:

"In 1895 the legislature of this State thought it wise to pass a law relative to the adulteration of food and food products. Perhaps there may have been some amendments since that time, but that was the foundation of the law. That law covers lemon extract, as it covers all other products that are sold on the market. It seems at the time that the law was passed and since that time there hasn't been— There isn't incorporated within that law any specific formula for the manufacture of lemon extract. Now, we can hardly say, gentlemen of the jury, that, at the time of the passage of that law, the legislature didn't have some recognized and defined standard by which these essences or extracts should be governed or controlled. I think it would be hardly fair to the legislature to claim that there wasn't a standard they had in their mind at that time, and, for the purposes of this case, I will instruct you, gentlemen, that at that time, and at this time, this standard that appears here in the United States Pharmacopœia is the standard recognized by the legislators of this State, and the one to which—the one that is in force, so far as it applies to the pure food law of this State, with reference to that particular product. And if this lemon extract here is manufactured in conflict with that formula, as I shall hereafter call your attention to it, and you should so find from the evidence, why, it would be your duty to convict the defendant here.

"By that formula it appears that it is necessary to have 5 per cent. of lemon oil in the lemon extract, and that lemon oil should be cut by a sufficient quantity of alcohol to perform that act. Of course, you know that that means,

in common parlance, it should dissolve the oil. . In addition to that, as the evidence tends to show in this case, after those things are put together, the fluid, whatever it might be, would be nearly the color of water.  As coloring, there may be or should be 5 per cent. of lemon rind; and those ingredients, when added together, would be lemon extract; and that, gentlemen, will be the standard as applied to the pure food law of this State.

"Now, gentlemen, I don't mean by that statement that lemon extract cannot be manufactured by any other process except by that to which I have called your attention; I don't mean that.  It is the claim of the defendant here that he has discovered a process by which he can manufacture lemon extract containing all of the qualities that lemon extract manufactured according to that formula would possess, and not have entirely all of the ingredients in the first instance that are provided in the formula. And as I view this case, gentlemen, that is one of the important propositions in connection with this case,—that and the question of coloring, in the judgment of the court, is the case,—and that all of the testimony in the case here revolves itself about those two propositions.

" It is the claim of the defendant, as I say, he has discovered a process by which he can produce in this lemon extract all of the qualities that would be produced by adding alcohol and lemon oil together, and that, manufacturing it by that means, he produces it chemically by taking a larger quantity of lemon oil and extracting certain parts of it.  Now, gentlemen, if you find and are satisfied by the evidence in this case that, after this lemon extract was manufactured as defendant here claims he did manufacture it, it possesses all the qualities in strength and otherwise that it would possess if manufactured according to this formula, he is not guilty under this law; that is, he is not guilty of manufacturing an impure article, unless there are certain other articles that enter into the case, to which I call your attention.  As I say, in the first instance, it is claimed that, according to the formula, it should be alcohol and 5 per cent. of lemon oil.  Now, if he, by some other process, can manufacture from the lemon oil and alcohol a product that would contain all of the elements that these two elements would contain if so mixed, he would not be guilty so far, and that would be lemon extract, except the color of it.

" It is conceded here by all parties in interest, I think,

that the only object of the lemon peel is to produce coloring. But there is another element to which the prosecuting attorney has called our attention. The evidence tends to show, gentlemen, that, if this product is produced as claimed here on the part of the defendant, after production by his process, the product would be nearly water white. As I say, if it contained all of the elements of lemon extract, I don't think he would be guilty, under this law; and if you are so satisfied, of course, at that point it would be your duty to find a verdict of not guilty, unless there is some other matter in which he has violated this law.

"There is another provision of this pure food law that provides that ingredients shall not be colored. In this case it appears that after this fluid substance is produced, which he claims is just the same as produced under this formula, he desires to change it to a lemon color. In other words, he puts in an ingredient which he claims would produce the same effect as this lemon rind. What is the object, gentlemen, or what was the object, of Mr. Jennings' adding this color? If the object was by any means to make it appear better or of greater value than it really is, if that was the object in adding that product, it is your duty, without any question, to find this defendant guilty, because he hadn't any right to add that kind of a product or any other kind of a product to this fluid which he had produced, and sell it for lemon extract, because that is a direct violation of one of the provisions of this pure food law."

We think this charge presents fairly three questions for consideration: *First*, whether the pharmacopœia formula is to be considered as defining lemon extract; *second*, if so, whether an omission of ingredients not essential to its purposes as a food product is a violation of the statute; *third*, whether the instruction relative to the addition of coloring matter should be sustained.

The statute defining what shall be deemed adulteration, so far as it relates to this case, declares that an article shall be deemed adulterated:

"*First*, if any substance or substances have been mixed with it, so as to lower or depreciate or injuriously affect its quality, strength, or purity; *second*, if any inferior or cheaper substance or substances have been

substituted wholly or in part for it; *third,* if any valuable or necessary constituent or ingredient has been wholly or in part abstracted from it; *fourth,* if it is an imitation of, or is sold under the name of, another article;  *  *  *  *sixth,* if it is colored, coated, polished, or powdered whereby damage or inferiority is concealed, or if by any means it is made to appear better or of greater value than it really is; *seventh,* if it contains any added substance or ingredient which is poisonous or injurious to health." 2 Comp. Laws, § 5012.

We are agreed with the circuit judge that in referring to articles of food, and to protect the users thereof, the legislature must have had in view some standard; and, as lemon essence or lemon extract had theretofore acquired a well-defined meaning, we incline to the view that it is proper to resort to the pharmacopœia formula for the purpose of determining what lemon extract consists of. Does it follow from this that the legislature intended to prohibit improvement in the manufacture of lemon extract? If a means should be discovered by which a larger percentage of the flavoring quality of the lemon might be extracted, would it be an infraction of this law that the manufacturer should use such larger proportion of the essential ingredient of the lemon extract? We think not. We think it is open to manufacturers to improve a common article of food, so long as no infringement of the law or spirit of the act defining what shall be deemed adulteration takes place. According to the proofs offered by the respondent, it is very clear in the present case that no substance or substances have been mixed with this extract so as to lower or depreciate or injuriously affect its quality, strength, or purity.

As to the second condition of what amounts to adulteration, the case is not so clear. This provides that, if any inferior or cheaper substance or substances have been substituted wholly or in part for it, it shall amount to adulteration. We think, however, this provision should be read in connection with the succeeding one, to wit, "if any valuable or necessary constituent or ingredient has been

wholly or in part abstracted from it." So construed, the provision prohibiting the substitution of any inferior or cheaper substance, wholly or in part, for it, means the substitution for an essential ingredient of such cheaper or inferior substance. Now, if it be a fact, as the testimony on the part of the respondent tends to show, that it is a positive advantage to exclude the terpenes wholly from the extract, and to lessen the quantity of alcohol used, then the essential ingredients of lemon extract have not had substituted for them anything inferior or cheaper. We are aware that this view of the law may make it more difficult to establish the individual case, but, as the statute is a penal statute, it should receive a strict construction.

It follows from the views above expressed that the instruction of the learned circuit judge was erroneous, inasmuch, as the jury were told, in effect, that if *any* ingredient of lemon essence, as defined by the pharmacopœia, was wanting in this extract sold by the respondent, there should be a conviction. We think the instruction should have been that if the lemon extract sold by respondent contained all the ingredients, and in quantities such as prescribed by the pharmacopœia, which are adapted to use as food, and that nothing was eliminated except such ingredients as could be dispensed with without injury to the product as a food product, there was no violation of the statute.

The only other provision of the statute involved is the sixth, which, in effect, prohibits coloring the article produced, whereby damage or inferiority is concealed. The instruction upon this branch of the law was also erroneous, if we are correct in our view of the main question. The elimination of nonessential ingredients from the extract certainly does not show damage or inferiority, and, as the conceded facts are that the coloring matter employed was not injurious to health in any way, this provision has no application.

The other questions discussed do not require special mention. It may be noted, in passing, that the circuit

judge, in referring to the testimony of expert witnesses, spoke of it as "boughten testimony." We think this expression was unfortunate. While it is proper for the jury to take into account the fact that expert witnesses are employed at an extra compensation paid them, the implication that the extra compensation necessarily amounts to a purchase of their testimony is hardly warranted. While the jury may consider this fact as bearing on their credibility, it is not proper that the court should intimate an opinion of that character.

The conviction should be reversed, and a new trial ordered.

The other Justices concurred.